IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MEGAN NEWBURN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **Civil No. 13-cv-1265-CJP**[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Megan Newburn seeks judicial review of the final agency decision denying in part her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in May, 2008, alleging disability beginning on June 1, 2008, shortly after her eighteenth birthday.   The application was denied by ALJ Michael Scurry on August 19, 2010.  (Tr. 97-109).   The Appeals Council remanded the case.   (Tr. 118-119).

After gathering additional evidence and holding another evidentiary hearing, ALJ Scurry issued a partially favorable decision on September 6, 2012.   He found that Ms. Newburn was not disabled from June 1, 2008, through April 9, 2009, but she became disabled as of April 10, 2009.  (Tr. 21-41).   The Appeals Council

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 9.

1

denied review, and the September 6, 2012, decision became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.   Plaintiff filed a motion for summary judgment at **Doc. 22.**

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.  The ALJ erred in determining the date of onset of disability.

2.  The ALJ's credibility determination was erroneous.

3.  The ALJ erred in assessing the opinion evidence and in determining RFC.

4.  The ALJ should have found that plaintiff's impairments meet the requirements of a Listing.[2]

5.  The ALJ's decision was not supported by substantial evidence for the above reasons.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[3]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

---

[2] This point is undeveloped and is deemed waived.  *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of

the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job**.** *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Newburn was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether

4

any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

ALJ Scurry followed the five-step analytical framework described above.   He determined that plaintiff had not worked since the alleged onset date.   He found that, since the alleged onset date of June 1, 2008, plaintiff had severe impairments of Asperger's Disorder, major depressive disorder, and a history of probably secondary generalized tonic clonic seizures.[4]   He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that, prior to April 10, 2009, Ms. Newburn had the residual functional capacity (RFC) to perform work at all exertional levels, with a number of

---

[4] "Asperger syndrome (AS) is an autism spectrum disorder (ASD), one of a distinct group of complex neurodevelopment disorders characterized by social impairment, communication difficulties, and restrictive, repetitive, and stereotyped patterns of behavior. . . . ASDs are considered neurodevelopmental disorders and are present from infancy or early childhood."   See, http://www.ninds.nih.gov/ disorders/ asperger/ detail _asperger.htm, accessed on February 11, 2015.

nonexertional limitations arising from her mental impairments.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled prior to April 10, 2009, because she was able to do jobs which exist in significant numbers in the local and national economies.

<u>**The Evidentiary Record**</u>

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

**1.    Agency Forms**

Plaintiff was born in 1990, and was 18 years old on the alleged onset date of June 1, 2008.   (Tr. 279).   She alleged disability due to Asperger's, severe depression and seizures.   (Tr. 283).

Plaintiff submitted a Function Report in May, 2008, in which she stated that she usually spent her days playing on her computer, watching movies, and playing with her baby sister.   She lived at home with her parents.   She saw a counselor every other week.   She alleged difficulty with short-term memory, concentration, understanding, and following verbal instructions.   Noise was a big distraction for her.   She had a "hard time understanding others' feelings and social cues."   (Tr. 290-296).

Plaintiff's mother filed a report in which stated that plaintiff was still in high school.   She took the bus to school.   On non-school days, she isolated herself in her room.   She was unable to drive a car because she had trouble orienting herself

to directions and had little awareness of others around her.   Her mother took her shopping about once a month because "Left on her own, it would take hours because she had to look at and touch everything."   Plaintiff's current obsessions were playing SIMS on the computer, watching silent films, and Bela Lugosi.   She had other obsessions in the past.   Plaintiff feared cars, avoided certain fabrics, had no tolerance of noise, and her memory was poor.   Stress caused her depression to become worse "to the point of bordering on suicidal.   Plaintiff hated change and must adhere to her routine.   She had difficulty with completing tasks, memory and concentration.   (Tr. 301-307).

She had not had a seizure for several years.   (Tr. 309).

### 2.    Evidentiary Hearings

The first hearing was held on June 23, 2010.   Plaintiff was represented by an attorney.   (Tr. 1122).

Plaintiff's mother, Lisa Newburn, testified that her teachers gave her extra time to complete her assignments.   She would leave class and go to the guidance counselor's office because she was upset about once or twice a week.   At home, she would isolate herself in her room.   Her interaction with her younger brother and sister was limited because she was unable to recognize their limitations as children. Plaintiff had an on-line relationship with a man.   Plaintiff referred to them as "engaged", but her mother said that most people "would see it as very unrealistic." Plaintiff became "very defensive" when her mother tried to talk to her about this. Plaintiff did not have normal social interaction with people.   She would not meet people's gazes, and had "very little situational awareness."   (Tr. 1146-1150).

Plaintiff did not bathe every day.   (Tr. 1153).

Ms. Newburn was again represented by an attorney at the second evidentiary hearing on August 8, 2012.   (Tr. 53).

Ms. Newburn graduated from high school in May, 2008.   She thought about going to college, but could not make up her mind.   She did not do much that summer except compete in a singing contest at a county fair.   She then competed at the state fair in January, 2009.   (Tr. 58-60).   She testified that she could not work because she had trouble interacting with people.   She could read and write well, and did very well in school.   The end of school was hard for her because she was losing the routine that she was used to.   (Tr. 61-62).   She got a 26 or 28 on the ACT exam.   (Tr. 65).

Plaintiff testified that she made mostly As in school, and graduated tenth in her class.   She todlthe ALJ that she was "getting very, very angry that you are stressing my grades in school."   She stated that there were many times that she skipped class and stayed in the locker room all day because she was upset.   (Tr. 65-66).   She had worked in a sheltered workshop program at FAYCO.   She had meltdowns during the workday.   (Tr. 69).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at all exertional levels, limited to only routine, simple and repetitive tasks, only occasional contact with the general public, coworkers and supervisors, occasional climbing of ramps and stairs, no climbing of ladder, ropes or scaffolding, and no concentrated exposure to

workplace hazards.   The VE testified that this person could several jobs in the economy.   Examples of such jobs are hand packager, laundry worker, and cleaner. (Tr. 27-73).

### 3.     Medical Treatment

Plaintiff was hospitalized for five days in February, 2006, due to suicidal thought.   She wore all black clothing, was "into Goth," and was "hyperreligious." She had been in counselling at Community Resource Center since the age of 13. She had a history of Asperger's Syndrome.   She was treated in the hospital with medication and therapy, and was discharged in stable condition.   (Tr. 493-494).

Plaintiff began seeing Michael Ernst, D.O., a psychiatrist, in April, 2006. She had a history of an "agitated state when she has to adapt [to] a change."   She had transient suicidal thoughts.   She was "very rigid and inflexible" and was "fixated on parts of objects, rather than the whole situation."   She had poor eye contact and problems understandings verbal and nonverbal cues.   She had been placed on Lexapro and Risperdal in the hospital.   She also took Tegretol for seizures.   On exam, attention and concentration were intact.   Her thoughts were well organized.   Her mood was depressed and her affect was blunted.   The diagnoses were major depressive disorder and Asperger's Syndrome, and possible bipolar disorder.   Dr. Ernst continued her Lexapro and increased her dose of Risperdal because of ongoing episodes of agitation.   (Tr. 588-589).

Plaintiff continued to see Dr. Ernst at regular intervals.   He adjusted her medications as needed.   On January 7, 2008, he noted that she was doing well and her grades were good.   She had a part in the school musical, and she was going to

go on a group trip to Washington, D.C.   (Tr. 580-587).

Ms. Newburn also saw a counsellor at Community Resource Center at regular intervals, beginning in 2003.   (Tr. 641).   In January, 2008, counselor Lyn Gartke noted that she engaged in "play therapy with Barbies."   (Tr. 839).   In February, 2008, she was "excited about playing [B]arbies and engaging in her story telling skills."   She was "best able to talk when she wants to tell a story but when prompted she gets very agitated."   (Tr. 841).   In a family therapy session in April, 2008, plaintiff's mother stated that she and plaintiff's father were concerned about finances for plaintiff and about their fear that plaintiff would give up after graduation from high school and try to hurt herself again.   She had been accepted at Lakeland College, but, according to her mother, she thought "Lakeland is a joke." The mother said that a school counselor encouraged plaintiff to get an apartment in Mattoon, but the parents did not think they could afford it and they did not believe plaintiff could "make it" with her Asperger's, OCD tendencies and temper tantrums. Plaintiff mostly stayed in her room alone, playing with Barbie dolls.   Plaintiff was in the waiting room during the counsellor's conversation with her mother.   She "stomped into the room, threw her bag on the chair, and screamed vulgarities at this therapist for talking with her mother for so long and not including her." Plaintiff then demanded that the counsellor engage in play therapy with dolls.   (Tr. 843-844).

The records of Community Counselling indicate that, for the rest of 2008, plaintiff continued to be very eager to do play therapy with dolls in counselling sessions.   She stated that it was "the only way I know how to release my feelings

without cutting on myself or hurting me."   (Tr. 850).

Dr. Ernst saw plaintiff in July, 2008.   She had graduated from high school. She reported that she had a "good trip to D.C." and she had gone on a senior trip to Florida.   She was dating a previous boyfriend and had competed in a singing contest at the state fair.   She was more confident and less anxious.   She still could not drive.   She was to return in six months.   (Tr. 721).

Stephen F. Vincent, Ph.D., performed a consultative psychological exam on August 5, 2008.   In his opinion, she manifested indices of an autistic disorder consistent with Asperger's, including "one-sided, long-winded conversations, many times needing redirection in order to stay focused."   Much of her speech was irrelevant to the questions and testing process.   She was sluggish, with psychomotor retardation and unusual nonverbal communication, including keeping her eyes down and not looking at him.   She had few facial expressions and had unusual and awkward hand positions.   Her social skills were awkward.   She had difficulty in regard to counting and was "preoccupied with self-talk."   She seemed distant and detached, and spoke in a monotone.   Her mood was depressed.   Her thought processes were slow and concrete, and her insight and judgment were limited.   Dr. Vincent described her as a "diagnostically interesting and rather complicated young lady, with a history of Asperger's syndrome and with developmental delays in regards to social, as well as emotional development and capacity to relate without appearing somewhat odd, aloof, sluggish and lethargic, apathetic."   He diagnosed Asperger's disorder and major depression, and stated that he did not believe that "she had the cognitive capacity to effectively manage her

11

own funds."  (Tr. 723-727).

In August, 2008, counsellor Gartke noted that plaintiff had a depressed mood and felt hopeless and helpless.  She was irritable, made poor eye contact, and was angry and upset at her family.  She brought in a recording of her "autistic brother screaming repeatedly, her baby sister crying and screaming and her mother slamming the doors and yelling at the children."  Plaintiff curled up in a fetal position and covered her ears.  (Tr. 852).  Two weeks later, her mother reported that she had not been granted disability, and she was fearful about plaintiff's lack of ability to care for herself.  (Tr. 854).  In September, 2008, plaintiff said she wanted to move out and get a job.  She thought she could stock shelves, but could not cashier.  (Tr. 855).  In October, 2008, plaintiff told Ms. Gartke that she felt her depression began when her younger brother was born.  She was angry because her mother changed the password on the computer.  (Tr. 858).  In November, 2008, plaintiff was frustrated with her father for telling her that people online are not always who they claim to be.  She stated that she knew that she was "at the very high end of Autism and I know I have to do things myself [and] not in a group."  (Tr. 860).  In December, 2008, plaintiff told Ms. Gartke that she had stopped taking her medications.  She wanted to see if she could get along without them because she would lose her insurance coverage when she turned 19.  She felt more irritable and worried about her future.  She said she guessed that she needed "some organization" to help her.  (Tr. 862).  On December 30, 2008, she was irritable and negative about her life circumstances.  She was going to sleep very late and was sleeping all day.  She made minimal eye contact.  (Tr. 864).

Dr. Ernst saw plaintiff on January 8, 2009.   He wrote that she had been noncompliant with her medications since March.   She had been worried about not being able to afford them.   Her mother reported that she had not been getting dressed and had poor hygiene and worsening social performance.   He restarted her on Lamictal and Lexapro.   (Tr. 814).

In January, 2009, she reported to Ms. Gartke that she was taking Lamictal again.   She was smiling, vocal and "talking nonstop."   (Tr. 866).   She was assessed by counselor Lyn Gartke on January 27, 2009.   Her diagnoses were major depressive disorder, single episode, moderate and Asperger's Disorder. Plaintiff had graduated from high school the previous May.   She "had unrealistic expectations of living independently as she has not learned any daily living skills and has poor social adjustment outside her comfort zone with her family."   She was disheveled and her grooming was poor. She expressed herself "theatrically" through the voice of Bela Lugosi or through play therapy.   She had fantasies of finding the man of her dreams and getting married "without the social eptness to engage in long term relationships with age appropriate peers." (Tr. 825-826).

The next month, her counsellor noted she was still taking her medications, but she was agitated with a depressed mood, sad effect and no eye contact.   She turned physically sideways away from the counsellor.   She "sang a performance with the dolls."   Ms. Gartke noted that plaintiff "becomes self absorbed and interacts with the dolls even she is not playing as one of them."   Plaintiff "goes back and forth with her being herself and the dolls."   Plaintiff took pictures of the dolls and "yelled at them for not standing upright."   (Tr. 867).

13

On February 12, 2009, Dr. Ernst noted that plaintiff was back on her medications and her mood was stable.   She was "[s]till not motivated" and had no plans for school or work.   She had trouble socializing.   There was some improvement in her hygiene.   (Tr. 815).

On February 29, 2009, plaintiff reported to her counselor that she did not hit her brother like she used to, but she screamed at her family more because she could not stand the noise.   (Tr. 868).   In April, 2009, she had broken up with "an internet boyfriend she met on myspace."   (Tr. 871).   In May, 2009, she brought in a copy of an email from a boy in Bangladesh who wanted to marry her.   She said she needed to get $3,000.00 together to marry this boy.   She was irritated because her mother and cousin were not happy for her and did not think it was a good idea. (Tr. 873- 874).

On April 16, 2009, Dr. Ernst noted that she was relatively stable.   She was not socializing, but she was helping around the house and taking care of her hygiene.   She had no significant anger or depression.   (Tr. 816).   At the next visit, in August, 2009, plaintiff told him she had been dating for two to three months and was planning on getting married.   Her boyfriend was Indian, lived in Saudi Arabia, and had never been to the United States.   They had not yet met in person. Dr. Ernst wrote that she was "very intelligent, but little social skills."   (Tr. 817).

### 4.    Dr. Zec's examination and report

Ronald Zec is a board certified clinical neuropsychologist and an Associate Professor at Southern Illinois University School of Medicine.   He performed a neuropsychological assessment of plaintiff on the referral of Drs. Jenson and Ernst

14

to determine her cognitive strengths and weaknesses.  His detailed report, dated April 10, 2009, is located at Tr. 910-940.

Dr. Zec concluded that plaintiff has Asperger's disorder and probable Nonverbal Learning Disability, and that she equivocally meet the criteria for ADHD (inattentive type) or some other condition that caused ADHD-like symptoms.  He summarized his findings and conclusions at Tr. 910-912.  He found that Ms. Newburn has the following limitations:

1.    Qualitative Impairment in Social Interaction:

    a)    Marked impairment in the use of multiple nonverbal behaviors(eye-to-eye gaze, facial expression, body postures and gestures to regulate social interaction);

    b)    A moderate to severe failure to develop peer relationship appropriate to developmental level;

    c)    A severe degree of the lack of spontaneously seeking to share enjoyment,   interests, or achievements with other people; and

    d)    A moderate to severe lack of social or emotional reciprocity.

2.    Restricted Repetitive and Stereotyped patterns of Behavior, Interests, and Activities:

    a)    Moderate to severe degree of encompassing preoccupation with one or more stereotyped and restricted patterns of interest that is abnormal either in intensity or focus; and

    b)    Mild to moderate degree of apparently inflexible adherence to specific, nonfunctional routines or rituals.

3.    Symptoms of non-verbal learning disability (visual/spatial, motor, social/emotional, and academic domains):

    a)    Moderate to severe limitations in 6 of 15 areas and moderate limitations in 8 of 15 areas of visual/spatial functioning;

    b)    Overall moderate impairment in "motor symptoms in everyday

life;"   including moderate symptoms exclusively for 3 out of 19 criteria assessed, moderate-severe symptoms for 3 out of 19 criteria assessed, and severe symptoms exclusively for 2 out of 19 criteria assessed;

    c)    Overall severe impairment "social emotional;" and

    d)    Overall moderate impairment in academic functioning.

4.    Indices of ADHD, including significant clusters in activation, attention, effort, affect, and memory.

5.    Clear impairment in everyday executive functioning with clinically significant levels of apathy, disinhibition, and dysexcutive functioning .

Dr. Zec noted that plaintiff had gone to a small school where the teachers and other students recognized that she was "different."   She graduated in the top ten out of forty students.   (Tr. 914).   He observed that she demonstrated some OCD tendencies during the testing.   (Tr. 917).

Dr. Zec's report includes a detailed discussion of Nonverbal Learning Disorder.   He pointed out that a "diagnosis of nonverbal learning disorder has no correlation to level of intelligence."   (Tr. 924, emphasis in original).   Further, "Because of their verbal strengths, many individuals with NLD succeed in formal educational situations.   However, if their social competence has not developed commensurately, they may not find and keep employment at the level for which their education has prepared them."   (Tr. 927).   There is some overlap between the symptoms of Asperger's and of NLD.   As many as 80% of people with Asperger's "have neuro-psychological profiles consistent with NLD."   (Tr. 925-926).

Dr. Zec summarized his conclusions as follows:

> Her ability to live independently, pursue higher education, and to work
> will be negatively affected by the combination of [the] following
> problems found on this assessment: a) Asperger's Disorder with
> associated impairment in social functioning (*which is her primary
> disabling condition*), b) Non-Verbal Learning Disability and associated
> impairment in visuospatial functioning, problem solving, and
> *everyday* executive functioning, c) impairment in aspects of new
> learning and memory, and d) depression and anxiety.

Tr. 912 (emphasis in original).

Dr. Zec also stated that it would be "worthy goal" for plaintiff to live as independently as possible.   He recommended training in independent living skills and noted that the living arraignment options include a group home or supervised living in her own place.   (Tr. 913).

## Analysis

ALJ Scurry concluded that Ms. Newburn became disabled as of April 10, 2009, the date of Dr. Zec's report.   Plaintiff argues that the ALJ erred in his determination of her onset date.

"Where, as here, a claimant is found disabled but it is necessary to decide whether the disability arose at an earlier date, the ALJ is required to apply the analytical framework outlined in SSR 83–20 to determine the onset date of disability." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). The onset date of disability is defined as "the first day an individual is disabled as defined in the Act and the regulations."   SSR 83-20, 1983 WL 31249, at *1.   In the case of slowly progressive impairments, SSR 83–20 does not require the impairment to have reached the severity of a listed impairment before onset can be established.   SSR 83-20 at *2.   Instead, "[t]he onset date should be set on the date

17

when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death." *Briscoe*, 425 F.3d at 352 (quoting SSR 83–20 at *3).

For disabilities of non-traumatic origin, SSR 83-20 requires the ALJ to consider three things when determining the onset date of disability: the claimant's allegations, the claimant's work history, and the medical and other evidence. SSR 83-20 at *2. The date alleged by the claimant is the "starting point" in determining the onset date, and that date should be used if it is consistent with all available evidence. SSR 83-20, at *2, 3. The medical evidence is "the primary element in the onset determination" and the chosen onset date "can never be inconsistent with the medical evidence of record." SSR 83-20 at *2. "This does not mean that a claim is doomed for lack of medical evidence establishing the precise date an impairment became disabling." *Briscoe*, 425 F.3d at 353 (emphasis in original); see SSR 83-20 at *2. "In such cases, the ALJ must infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process, and should seek the assistance of a medical expert to make this inference." *Briscoe*, 425 F.3d at 353 (citing SSR 83-20 at *2) (internal quotation marks omitted).

ALJ Scurry did not explicitly refer to SSR 83-20 in deterring the onset date. That omission would not be fatal if he "nevertheless properly applied the requisite analysis." *Briscoe*, 425 F.3d at 352. However, he failed to do so here.

ALJ Scurry concluded that plaintiff's impairments became disabling as of the

date of Dr. Zec's report, April 10, 2009.   He based this conclusion on his analysis of the weight to be given to Dr. Zec's report.   He determined that the report was entitled to "no weight" for the period prior to April 10, 2009, and it was entitled to "great weight" for the period of April 10, 2009, into the future.   He gave four reasons for this conclusion: (1) Dr. Zec's findings are based in part on the subjective complaints of plaintiff and her mother; (2) his findings are internally inconsistent; (3) his findings are inconsistent with plaintiff's school history and ACT score; and (4) his findings are inconsistent with plaintiff's ability to go on school trips and perform in a school play.   (Tr. 34-35).

The ALJ's reasons for finding that plaintiff became disabled only as of April 10, 2009, are illogical and not supported by the record.   If the validity of Dr. Zec's opinion is undermined by his reliance on the statements of plaintiff and her mother, that would be a reason for not giving the opinion any weight at all, not for giving it no weight before April 10, 2009, and great weight thereafter.   The same is true of the alleged inconsistencies in his findings.   Further, the ALJ identified only one inconsistency, i.e., that plaintiff displayed a clear impairment in *everyday executive functioning* based on her statements and those of her mother, but testing showed she was above average in *performance-based measures of executive functioning*.   It is far from clear that this was an inconsistency.   Dr. Zec's report made a distinction between everyday executive functioning and performance-based measures of executive functioning.   See, Tr. 911.   The ALJ's apparent assumption that they are the same is not supported by any medical opinion.   An ALJ errs when he "plays doctor."   *Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014).

19

The ALJ also thought that Dr. Zec's opinions were inconsistent with plaintiff's good grades and high ACT score. This ignores Dr. Zec's statement that plaintiff has NLD, that many of the symptoms of NLD overlap with Asperger's, and that many people with these symptoms "succeed in formal educational situations." Further, plaintiff graduated from high school in May, 2008. She claims she became disabled as of June 1, 2008. The fact that she got good grades and was able to go on a class trip and act in a school play before June 1, 2008, does not support a finding that she became disabled only as of the date of Dr. Zec's report.

The Commissioner points out that the ALJ's determination of the onset date must be affirmed if it is supported by substantial evidence, despite the fact that the evidence could also support an earlier date. See, Doc. 35, p. 7, citing *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999). She is correct, but plaintiff's point here is that substantial evidence does *not* support the onset date of April 10, 2009.

The Commissioner concedes that the "choice of April 10, 2009, as the specific onset date was doubtless due to Dr. Zec's examination on that date." See, Doc. 35, p. 6. She nevertheless argues that the onset date of April 10, 2009, is supported by the record. She argues that the ALJ reasoned that plaintiff's condition worsened after graduation and that he noted her new therapist began recording more serious limitations by early 2010. Doc. 35, pp. 6-7. The Commissioner does not attempt to explain how these observations support the choice of April 10, 2009, as the onset date. In addition, the ALJ gave short shrift to Dr. Vincent's report of his August 5, 2008, consultative exam. Dr. Vincent set forth

a number of abnormal findings, but the ALJ mentioned only his opinion that plaintiff was unable to manage her own funds.   Dr. Vincent was a state agency consultant.   The failure to consider his whole report further undermines the ALJ's determination of the onset date.   *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir 2014).

"[T]he established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record."   And, "Convincing rationale must be given for the date selected."   SSR 83-20, at *3.   The Commissioner observes that "imprecision is inherent to the task of inferring an onset date for an impairment not of traumatic origin . . . ."   Doc. 35, p. 6.   The Court agrees that determining the onset date can be difficult in a case such as this.   However, that does not excuse the ALJ from fixing a date that is supported by the   evidence and setting forth a convincing rationale for his determination.   Here, the ALJ appears to have arbitrarily chosen the date of Dr. Zec's report as the onset date.

SSR 83-20 provides that the ALJ "should" consult a medical expert if the date of onset must be inferred.   Plaintiff argues that it was mandatory for ALJ Scurry to consult an expert.   However, the Seventh Circuit has held that "should" does not mean "must" or "shall."   *Eichstadt v. Astrue,* 534 F.3d 663, 667 (7th Cir. 2008).   Where the medical evidence is complete, the ALJ is not required to consult a medical expert.   *Henderson,* 179 F.3d at 513.   See, also, *Pugh v. Bowen*, 870 F.2d 1271, 1278 n. 9 (7th Cir.1989).   According, this Court does *not* hold that ALJ Scurry erred in failing to consult a medical expert regarding the date of onset. However, the Court notes that the ALJ certainly could have consulted a medical

expert on the issue.   Perhaps, in view of the Commissioner's apparent belief that determining the date of onset is difficult in a case such as this, the ALJ would be wise to do so on remand.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Newburn was disabled before April 10, 2009, or that she should be awarded benefits for the period in question.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying Megan Newburn's application for social security disability benefits for the period from June 1, 2008, through April 10, 2009, is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   February 12, 2015.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**